# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 8794 | **DATE** | 2/11/2003 |
| **CASE TITLE** | Mahmoud Baghdady vs. Robbins Futures, Inc, et al., | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 3/13/2003 at 9:30 A.M.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order on defendant's renewed motion for summary judgment. Defendant's renewed motion for summary judgment is hereby denied.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | 3 | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | FEB 1 2 2003 | | |
| | Notified counsel by telephone. | | | date docketed | | 173 |
| | Docketing to mail notices. | | | | | |
| | Mail AO 450 form. | | U.S. DISTRICT COURT | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | 2/11/2003 | | |
| SM | courtroom deputy's initials | 03 FEB 11 PM 4:51 | date mailed notice | | | |
| | | Date/time received in central Clerk's Office | SM | | | |
| | | | mailing deputy initials | | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MAHMOUD BAGHDADY, )
)
    Plaintiff, )
)
v. )   Case No. 97 C 8794
)
ROBBINS FUTURES, INC., ROBBINS )   Magistrate Judge Ian H. Levin
TRADING COMPANY, JOEL ROBBINS, )
AND MARK MARTIN, )
)
    Defendants. )
)

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment as to Plaintiff's Second

Amended Complaint in the cause. For the reasons set forth below, the Court denies Defendants'

Motion for Summary Judgment.

DOCKETED

FEB 1 2 2003

## BACKGROUND FACTS

On September 11, 1997, Plaintiff Mahmoud Baghdady (hereinafter "Plaintiff") entered into

a written agreement to compete in a commodities futures trading competition; namely, the World

Cup Championship of Futures Trading Contest (hereinafter "Futures Contest"). (Defs.' LR56.1(a)(3)

St. ¶ 5[1]; Defs.' Ex. 1, attached to Defs.' Mem.) In order to enter the Futures Contest, Plaintiff

deposited $50,000 plus a $1,000 entry fee into a commodities account with Defendant Robbins

Trading Company ("RTC"), the sponsor of the Futures Contest, and Defendant Robbins Futures, Inc.

---

[1]Defendants have submitted a "stipulation of uncontested facts" which was part of the
parties' Final Pretrial Order. The Court will treat this stipulation as complying with LR56.1.

("RFI"), the broker of the account.[2] (*Id.* ¶ 7; 2nd Am. Complt. ¶¶ 6, 9.) Plaintiff signed a Customer Agreement, a World Cup Championship of Futures Trading Agreement, and a Risk Disclosure Statement for Futures and Options (hereinafter "Disclosure"). (Defs.' Exs. 1, 2 & C, attached to Defs.' Mem.) In signing the Disclosure, Plaintiff acknowledged that futures and options trading "carry a high degree of risk." (Defs.' Ex. 2, attached to Defs.' Mem.)

Before opening his account, Plaintiff told Defendants' principal, Lawrence Herst (hereinafter "Herst"), that he would be using a trading program that took advantage of discrepancies that occasionally appear in the markets. (Defs.' LR56.1(a)(3) St. ¶ 8.) Plaintiff explained to Defendants that he was essentially a delta neutral trader[3] and that he would need to adjust his positions in such a way that the positions would remain delta neutral so that the market fluctuations would not jeopardize his account and expose it to risk. (*Id.* ¶ 9.) Plaintiff further explained that in order to trade using his delta neutral trading approach, his account would have to be margined based on SPAN[4] margin requirements. (Defs.' LR56.1(a)(3) St. ¶ 10.) The application of SPAN margin requirements would have the effect of offsetting Plaintiff's positions; thereby, reducing the amount of margin

---

[2]The Court will refer to all defendants collectively throughout this opinion as "Defendants," unless otherwise noted.

[3]A delta neutral trader is "an arbitrageur who buys and sells exchange-traded options versus exchange-traded futures because of relative value considerations." (Defs.' LR56.1(a)(3) St. ¶ 9.) Thus, a delta neutral trader "does not bet on any direction of the market, nor does he attempt to predict, or seek to profit from, market moves." (*Id.*)

[4]SPAN is an acronym for "Standard Portfolio Analysis of Risk." (Defs.' LR56.1(a)(3) St. ¶ 10.) The Chicago Mercantile Exchange defines it as "a comprehensive system which is designed to accurately evaluate the risk in an entire portfolio, and to match performance bond [margin] to portfolio risk more accurately than previously used methods. SPAN treats futures and options uniformly, while recognizing the unique risk characteristics of options." (*Id.*) The use of SPAN margin requirements is an accepted practice within the futures industry. (Defs.' LR56.1(a)(3) St. ¶ 11.)

2

required to keep his position in the Futures Contest. (2nd Am. Complt. ¶ 12(b).) Defendants told Plaintiff that his account would be margined according to SPAN margin principles.[5] (Defs.' LR56.1(a)(3) St. ¶ 12.)

In accordance with the parties' agreement, Plaintiff faxed all proposed trades to Defendant Martin.[6] (2nd Am. Complt. ¶ 16.) Defendant Martin would pre-approve each of Plaintiff's trades, after ensuring that the SPAN margin requirements would apply and that sufficient margin existed. (*Id.* ¶¶ 15, 16, 17.) After Defendant Martin approved the trade, Plaintiff would call the trading desk to make the individual trade. (*Id.* ¶ 17.) The clerk at the trading desk would then confirm that each individual trade was pre-approved by Defendant Martin. (*Id.* ¶ 18.) Defendant Joel Robbins, the owner and operator of RTC and RFI, requested that Plaintiff open an independent, secondary trading account, so that he could deposit additional margin to meet maintenance calls based on SPAN margin calculations. (Defs.' LR56.1(a)(3) St. ¶ 12.) Plaintiff subsequently agreed to open a secondary trading account as requested by Defendant Martin. (*Id.*)

Plaintiff began trading pursuant to the parties' agreement on September 18, 1997. (Defs.' LR56.1(a)(3) St. ¶ 13.)

On October 15, 1997, Plaintiff was short S&P futures and S&P put options. (Defs.' LR56.1(a)(3) St. ¶ 14.) Plaintiff's position at the time was delta neutral at the market price. (*Id.*) On October 16, 1997 and October 17, 1997, the S&P futures market dropped substantially causing Plaintiff's short futures positions to generate a profit. (*Id.*) However, at the same time, the price of

---

[5]Defendants do not contradict or contest this statement. (Defs.' LR56.1(a)(3) St. ¶ 12.)

[6]Defendant Joel Robbins and Herst gave Defendant Martin the authority to pre-approve Plaintiff's trades. (2nd Am. Complt. ¶ 15.)

the S&P put options was increasing which meant that Plaintiff would need to recalculate his deltas and take the necessary action to neutralize his position. (*Id.*; 2nd Am. Complt. ¶ 24.)

On the morning of October 17, 1997, Defendant Martin called Plaintiff and told him that he owed a $100,000 margin call.[7] (Defs.' Reply at 4-5.) Defendant Martin requested that Plaintiff wire additional funds to cover the margin call. (Defs.' LR56.1(a)(3) St. ¶ 17.) Plaintiff indicated that he would send a wire transmitting additional funds and faxed Defendant Martin a copy of his instruction to his bank to wire $40,000. (*Id.* ¶ 18.) In addition to wiring funds, Plaintiff liquidated many of his positions based on the margin call. (Defs.' Ex. 10, Oct. 17, 1997 12:35-12:46 phone conversation b/t Baghdady and Martin).

That same day, on October 17, 1997, Defendant Robbins[8] directed that Plaintiff's trading account be liquidated because he had not meet the $100,000 margin call and a significant debit remained in his account. (Defs.' LR56.1(a)(3) St. ¶ 19; Defs.' Reply at 6.) Defendant Martin spoke with Plaintiff and told him that Defendant Robbins had made the decision to liquidate Plaintiff's account. (Defs.' LR56.1(a)(3) St. ¶ 19.) Plaintiff's account was subsequently liquidated that day.[9] (*Id.*) After the account was liquidated, Plaintiff called Defendants' trading desk employees and Defendant Martin a total of about twenty times, but no one would take Plaintiff's calls or orders. (*Id.* ¶ 20.)

---

[7]Defendants initially miscalculated Plaintiff's margin call at $400,000. (Defs.' Reply at 4.)

[8]On October 17, 1997, Defendant Robbins was in Colorado and not at his place of business. (Defs.' LR56.1(a)(3) St. ¶ 20.)

[9]Defendant Martin had pre-approved trades that were liquidated on October 17, 1997. (Defs.' LR56.1(a)(3) St. ¶ 19.)

Subsequent to the liquidation of his account, Plaintiff filed this lawsuit alleging that Defendants violated Section 4b of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 6b[10] by misrepresenting that he would be able to trade utilizing the delta neutral trading principle employing SPAN margin requirements, and he would be permitted to keep his positions open, remain in the market, and adjust his position based on the delta neutral trading principle if he wired money, even though he did not believe that a valid margin call existed. (*See generally,* 2nd Am. Complt.) Specifically, Plaintiff complains *inter alia* that (1) Herst told him that if he wired $40,000 he would be allowed to re-balance his positions by adjusting his deltas and that he would have "all day," on October 17, 1997, to liquidate in an orderly fashion; (2) he was not allowed to trade as a delta neutral trader using SPAN requirements; (3) SPAN margin requirements were not actually used to adjust his account; (4) the margin call was erroneously calculated as to his positions; (5) his account was liquidated in bad faith; and (6) after he wired the requested funds to meet the margin call, his account was liquidated without notice. (*See* 2nd Am. Complt.; Pl.'s Mem.; Defs' Mem. & Reply.)

Plaintiff seeks recovery of the $91,142.29 loss incurred by the liquidation of his account (i.e., net debit balance), the profits he lost from the liquidation of his account, and the monetary award for winning the Futures Contest.[11] (2nd Am. Complt. ¶¶ 43, 44, 51, 52; Defs.' LR56.1(a)(3) St. ¶ 21.)

## LEGAL STANDARD

---

[10]This section prohibits fraud in connection with the purchase or sale of commodity futures contracts. *Stotler and Co. v. Commodity Futures Trading Commission,* 855 F.2d 1288, 1291 (7th Cir. 1988); *Cange v. Stotler and Co., Inc.,* 826 F.2d 581, 589 (7th Cir. 1987). Thus, Section 4b of the CEA imposes liability on commodities brokers for misrepresentations and omissions of material facts, as well as for unauthorized trading. *Cange,* 826 F.2d at 589.

[11]Plaintiff alleges that he had ascended to the number one position in the Futures Contest. (2nd Am. Complt. ¶ 51.) Plaintiff further contends that he would have been the winner of the Futures Contest if his account had not been liquidated. (*Id.* ¶ 52.)

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial. *LINC v. Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997).

In deciding a motion for summary judgment, a court must "review the record in the light most favorable to the nonmoving party and to draw all reasonable inferences in that party's favor." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 964 (7th Cir. 1998). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the nonmovant may not rest upon mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also Linc*, 129 F.3d at 920. A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505 or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## ANALYSIS

Defendants bring the subject motion asserting that there is no genuine issue of material fact(s)

with respect to the sole issue left in the case; namely, the propriety or manner in which Defendants liquidated Plaintiff's account on October 17, 1997. (Defs.' Reply at 2.) Defendants contend that pursuant to the terms of the Customer Agreement, they properly liquidated Plaintiff's account because he failed to meet a $100,000 margin call. (*Id.*) Defendants, specifically, assert that Plaintiff's claim that Herst told him that if he wired $40,000 he would be allowed to re-balance his positions by adjusting his deltas and would have "all day" to liquidate his positions is irrelevant because the terms of the Customer Agreement prohibits oral agreements. (Defs.' Mem. at 5.)

In essence, Defendants contend that summary judgment should be granted in their favor because there are no genuine issues of material fact with respect to Plaintiff's claims that: (1) he was not allowed to trade as a delta neutral trader using SPAN requirements; (2) SPAN margin requirements were not actually used to adjust his account; (3) the margin call was erroneously calculated as to his positions; (4) his account was liquidated in bad faith; and (5) after he wired the requested funds to meet the margin call, his account was liquidated without notice.

## ISSUES

The Court has reviewed the issues raised in Defendants' summary judgment motion and finds that genuine issues of material fact exist with respect to these issues, as follows:

### A.     $40,000 Wire

Defendants first assert that the parties' Customer Agreement gave them the right to liquidate Plaintiff's account if he was unable to meet the $100,000 margin call. (Defs.' Reply at 4-6.) Paragraph 8 of the Customer Agreement states that if Plaintiff "fails to deposit sufficient funds to . . . satisfy any demands for original and/or variation margin . . . [Defendants] . . . may, without prior demand or notice, when and if [Defendants] deem appropriate . . . liquidate the positions in

[Plaintiff's] account . . . " (Defs.' Ex. C, attached to Defs.' Mem.) Furthermore, Paragraph 9 of the

Customer Agreement provides that "[Plaintiff] acknowledges that [he] shall be liable for all losses

in [his] account(s), including but not limited to losses incurred through a liquidation of [Plaintiff's]

account(s) . . . including, but not limited to, interest, costs, expenses and attorneys' fees . . . " (Defs.'

Ex. C, attached to Defs.' Mem.) Therefore, Defendants contend that because Plaintiff only wired

$40,000 of the $100,000 margin call, they appropriately liquidated his account in accordance with

the terms of the Customer Agreement. (Defs.' Reply at 2-5.)

Defendants further assert, based on a tape recorded phone conversation between Plaintiff and

Defendant Martin on October 17, 1997, that Plaintiff was clearly aware of the fact that he was on

margin call:

| | |
|---|---|
| Baghdady: | Meolo. All right. My question to you now is, since basically I'm out of the competition, why don't you just fund the account with the money you have, plus the money that's going to come so that I can – so they're getting wiped out, I can do something. |
| Martin: | Well. You're still on call though. I mean, you're on call for about 400 thousand. (Defs.' Ex. 5, Oct. 17, 1997 9:03-9:06 p.m taped phone conversation b/t Baghdady and Martin, p. 1.) |

(The call was reduced to $100,000.)[12]

* * * *

| | |
|---|---|
| Baghdady: | How much more do you want? |
| Martin: | At least another hundred thousand. |
| Baghdady: | I don't have – I have to do some finagling. I have to do some because I don't keep more than a hundred thousand liquid. |

---

[12]Defendants concede that they erroneously calculated Plaintiff's margin call at $400,000. (Defs.' Reply at 4.) However, after Plaintiff pointed out that several trades had been incorrectly placed in his account, Defendants removed the incorrectly placed trades and recalculated Plaintiff's margin call at $100,000. (*Id.*)

| Martin: | I understand that. I'll take a T-bill. |
| Baghdady: | Huh? |
| Martin: | I'll take a T-bill. |
| Baghdady: | I have them all in stocks and stuff (inaudible). |
| (Inaudible): | I'm talking what (inaudible) or something. I'll see what I can do. (Defs.' Ex. 5, Oct. 17, 1997 9:03-9:06 p.m taped phone conversation b/t Baghdady and Martin, pp. 2-3.) |

Defendants, therefore, contend that based on this taped phone conversation, Plaintiff knew about and had an opportunity to meet the margin call, but sent only $40,000, rather than the $100,000 required to meet the call. Thus, according to Defendants, Plaintiff not only had notice of the liquidation, but he also initiated it and actively participated in it as demonstrated by the following statement:

| Baghdady: | No, no. I'm liquidating. I'm doing what I'm supposed to do to get it done. If you put this kind of pressure on me, I'm going to get – the same thing happened on Thursday – its my fault. I'm not blaming anyone, but instead of getting off the – I got off the futures. I got [expletive]. So that's not – Larry let me do it, and now I'm doing it for you. I'm writing (inaudible) without me knowing that you're at the desk. I was placing orders. (Defs.' Ex. 10, Oct. 17, 1997 12:35-12:46 p.m. taped phone conversation b/t Baghdady and Martin, p.5.) |

Plaintiff, on the other hand, asserts that he wired only $40,000, a portion of the $100,000 margin call, because Herst told him that if he deposited $40,000, he would be allowed to re-balance his positions by adjusting his deltas and that he would have "all day," on October 17, 1997, to liquidate his positions in an orderly fashion. (Pl.'s Mem. at 3-4; Baghdady Decl. ¶ 4.) As support for his proposition, Plaintiff references a tape recorded conversation he had with Defendant Martin, on October 17, 1997, during which Plaintiff refers to Herst on three separate occasions:

Baghdady:     *And I talked to Larry[13], and Larry's fine* . . . Okay. I'm doing
              everything you want to do, and *I spoke to Larry.* I explained
              everything. You're fine. I'm fine. You have a hundred thousand extra,
              so we can ease out to the positions. *We have all day,* and I'm working
              it for you, and I'll do everything you want. Just don't panic me,
              because if I get panicked, I'm going to get [expletive], okay? It's my
              money. (Defs.' Ex. 10, Oct. 17, 1997 12:35-12:46 p.m. taped phone
              conversation b/t Baghdady and Martin, pp. 2-3.)

The final reference appears later on in the conversation when Plaintiff reminds Defendant Martin

of the fact that the S&P market still has three hours of trading to go:

Martin:       What are we going to do with these spoos [sic]?

Baghdady:     With the what?

Martin:       The S and Ps.

Baghdady:     Yeah, we'll take care of them. We'll take care of them. I mean, we
              have three hours to go.

Martin:       I can't wait that long. I need them done.

Baghdady:     No. *Larry said we can wait. We'll do it before the market closes* . .
              . (Defs.' Ex. 10, Oct. 17, 1997 12:35-12:46 p.m. taped phone
              conversation b/t Baghdady and Martin. pp. 6-7.) (emphasis added.)

Therefore, Plaintiff asserts that based on his understanding with Herst, if he wired $40,000, a portion

of the margin call, he would have "all day" to adjust his positions.

Plaintiff further offers the declaration of Michael L. Maduff, an expert in the futures industry,

as support for his assertion that he was promised that he would have "all day" to adjust his positions.

(Defs.' Ex. 3, Maduff Dec. dtd. Apr. 24, 2001.) Regarding Plaintiff's $40,000 wire, Maduff states:

[A]n experienced trader [such as Plaintiff] would not have wired in $40,000 with no
understanding whatsoever; the brokerage firm must have made some kind of

---

[13]The alleged conversation between Plaintiff and Herst was not tape recorded;
consequently, there is no record of the conversation.

commitment to him. Furthermore, I understand that [Plaintiff] did offset a number of his positions. . . . Plaintiff wired in $40,000 in order to make his S&P position delta-neutral and to have the ability to wait until the end of the day to bring the position to delta-neutral and to deal with them in an orderly fashion during the trading day on which he wired that money.

. . . [S]uch a promise was extremely likely. The only reason a customer respond[s] to a margin call of $100,000 with a wire of $40,000 is a promise of some kind by his commodity broker. When a customer fails to meet a margin call, a broker can unilaterally liquidate the customer's positions in bulk, at once. It seems clear to me . . . that [Plaintiff] was trying to avoid that, and trying to deal with his positions in an orderly fashion. However, . . . [Plaintiff] was told that his remaining positions had to be liquidated "now." The broker did not allow [Plaintiff] any opportunity to adjust his deltas or lighten up his S&P positions in an orderly fashion even though [Plaintiff] had sent $40,000 and had liquidated positions. [A]n experienced trader [such as Plaintiff] would not have wired in $40,000 without a commitment of some kind from the brokerage firm – at a minimum, a commitment not to take the very action that was taken here, dumping his position into the market at once and in bulk fashion. (Defs.' Ex. 3, Maduff Dec. at 2-3.)

Defendants, however, argue that there was no such understanding or commitment between

Plaintiff and Herst regarding the $40,000 wire. (Defs.' Mem. at 5.) In his declaration, Herst states

that "[o]n October 17, 1997, [he] spoke to [Plaintiff], but at no time was there ever any

understanding or commitment whatsoever regarding a $40,000 deposit that he wired to the

company." (Herst Dec. ¶ 4.) Furthermore, Defendants contend that they did not have a "hundred

thousand dollars extra" as Plaintiff states in the tape recorded phone conversation. (Defs.' Reply at

9; Defs.' Ex. 10, Oct. 17, 1997 12:35-12:46 p.m. taped phone conversation b/t Baghdady and Martin,

pp. 2-3.) Rather, Defendants state that if Plaintiff had wired $100,000 to meet the margin call, he

would have had "all day" to liquidate his positions. (Defs.' Reply at 9.) Moreover, if Plaintiff told

Herst or others that he had met the margin call, he would have been told that he had "all day" to

liquidate his positions. (*Id.*)

Defendants assert, moreover, that even assuming *arguendo* that the conversation between

Plaintiff and Herst took place as Plaintiff alleges, Herst's alleged statements are irrelevant because the Customer Agreement is not subject to oral modifications that contradict its terms. (Defs.' Mem. at 5-6.) Pursuant to the terms of the Customer Agreement, Paragraph 16 provides that, "No provision of this Agreement can be amended or waived except in writing signed by an officer of RFI. No oral agreements or instructions contrary to any provision of this Agreement shall be recognized or enforceable." (*Id.*; Defs. Ex. C, attached to Defs. Mem.) Defendants further point to the fact that Plaintiff has failed to produce evidence of a written modification that allowed him to liquidate his position over the course of the trading day. (Defs.' Reply at 2, 4.)

Defendants cite *Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236-37 (7th Cir. 1991) where the court upheld a finding of summary judgement against the defendant who alleged an oral modification of a written agreement. In *Bank Leumi Le-Israel,* the court stated, "[Defendant's] only reference to an oral modification is the allegation in his affidavit opposing summary judgment . . . [He] argues that this bald assertion, without more, creates a genuine issue of triable fact." *Id.* at 236. The court found that the defendant's oral modification assertion was insufficient to overcome summary judgment because it contradicted his sworn deposition testimony. *Id.* at 237. Defendants, thus, assert that similar to *Bank Leumi Le-Israel,* Plaintiff's bald assertion of an "understanding or commitment" regarding the margin call directly contradicts his complaint, and moreover, there is no mention of such an "understanding or commitment" in the October 17, 1997 tape recorded conversations. (Defs.' Mem. at 6.)

Initially, the Court finds that Plaintiff's alleged understanding with Herst does not contradict Plaintiff's Second Amended Complaint. For instance, Plaintiff alleges that he was promised that he would be able to trade utilizing the delta neutral trading principle employing SPAN margin

requirements, and he would be permitted to keep his positions open, remain in the market, and adjust his positions based on the delta neutral trading principle if he wired money (implicitly satisfying the margin requirements), even though he did not believe that a valid margin call existed. (2nd Am. Complt.; Baghdady Decl. ¶¶ 4, 6, 10.) Moreover, *Bank Leumi Le-Israel* is distinguishable because Plaintiff's statement that Herst told him that if he deposited $40,000 (which implicitly would satisfy Plaintiff's margin requirements), Plaintiff would be allowed to re-balance his positions by adjusting his deltas and that he would have "all day" to liquidate his positions does not constitute the type of bald assertion or "vague reference" without any "specific facts" that existed in *Bank Leumi. Bank Leumi Le-Israel*, 928 F.2d at 236. Rather, Plaintiff, in a sworn declaration dated November 19, 2002, swears that he had a specific conversation with Herst regarding the $40,000 deposit which took place on October 17, 1997, the day his account was liquidated. (Baghdady Decl. ¶ 4.) Also, there is additional support for Plaintiff's alleged mutual understanding with Herst in the October 17, 1997 12:35-12:46 p.m. tape recorded phone conversation with Defendant Martin. In that conversation, Plaintiff specifically makes reference to Herst indicating that he had talked with him and they had "all day" to ease out of the positions. (Defs.' Ex. 10, Oct. 17, 1997 12:35-12:46 p.m. taped conversation b/t Baghdady and Martin, pp. 2-3, 6-7.)

Furthermore, the arrangement with Herst that Plaintiff sets forth is not an oral modification of the Customer Agreement. Rather, if true, it is consistent with and complies with the Customer Agreement in that Plaintiff's deposit of $40,000, agreed to by Herst, would in the terms of the Customer Agreement effectively "satisfy any demands for original and/or variation margin . . . " (Defs.' Ex. C, attached to Defs.' Mem.)

Therefore, based on the record, which essentially consists of only the parties' contradictory

statements, the Court finds that a genuine issue of material fact exists as to whether Herst told

Plaintiff that if he wired $40,000, he would have "all day" to liquidate his positions.

**B.    Delta Neutral Trading/SPAN Margin Requirements**

Defendants next contend that there are no genuine issues of material fact with respect to

Plaintiff's claim that Defendants fraudulently misrepresented that he would be able to trade as a delta

neutral trader using SPAN margin requirements. (Pl.'s Mem. at 8-9.)  Instead, "[a]ccording to

[Plaintiff], while he was able to trade for over one month using the delta neutral trading program,

[Plaintiff] alleges that defendants had no intention of permitting him to use this trading program

throughout the life of his account." *Baghdady v. Robbins Futures, Inc., et al.,* No. 97 C 8794, 1999

WL 162789, *5 (N.D. Ill. Mar. 12, 1999). In ruling on Defendant's initial summary judgment

motion, District Judge Holderman stated:

> [Plaintiff's] telephone conversation transcripts provide a genuine issue of material
> fact as to whether a fraudulent misrepresentation was made, of which [Plaintiff]
> claims he actually relied on to enter the Futures Contest. This court does not believe
> that these transcripts are immaterial but rather are relevant to the issue of fraud. (*Id.*)

Similarly, this Court having reviewed the telephone conversation transcripts (attached to Pl.'s 2nd

Am. Complt., Exs. A, B & C) finds that a genuine issue of material fact exists as to whether

Defendants misrepresented that Plaintiff would be able to trade utilizing the delta neutral trading

principle employing SPAN requirements.

The Court further notes that the parties are not in agreement as to whether SPAN margin

requirements were actually used to adjust Plaintiff's account on October 17, 1997. Defendants assert

that SPAN margin requirements were used, whereas Plaintiff maintains they were not used.

Furthermore, Defendant Robbins and Defendant Martin have produced affidavits affirmatively

stating that SPAN margin requirements were used in calculating Plaintiff's margin. (Defs.' Mem. at 5; Robbins Aff.¶ 4 ; Martin Aff. ¶ 5.) Upon review, the Court finds that a genuine issue of material fact remains with respect to this issue.

The Court next notes that Plaintiff alleges that if Defendants actually utilized SPAN margin requirements, genuine issues of material fact exist as to whether Defendants correctly applied the SPAN margin requirements and whether they correctly calculated SPAN margin requirements as applied to Plaintiff's positions. (Pl.'s Mem. at 8.) Plaintiff specifically argues that a genuine issue of material fact exists with respect to this issue(s), because Defendants admitted that they erroneously calculated Plaintiff's margin call at $400,000 when mistaken trades were placed in Plaintiff's account. (Id.; Defs.' Reply at 3.) Plaintiff further asserts that he told Defendant Martin (the individual responsible for overseeing margin requirements for Defendants' clients and for calculating Plaintiff's margin requirement on a daily basis) that he had incorrectly calculated Plaintiff's margin requirement.[14] (Pl.'s Mem. at 8-9; 2nd Am. Complt., Ex. A, Tape One, 36:9-

---

[14]In the following tape recorded conversation, Plaintiff points out to Defendant Martin that he incorrectly calculated Plaintiff's margin requirement:

| Baghdady: | Then what – what – what should have been done, we should have – should have started one of two things. To lighten up the options. |
| Martin: | That's correct. |
| Baghdady: | Or to sell more futures. Right? |
| Martin: | But you can't because the way the account – |
| Baghdady: | – No, I can't, but – |
| Martin: | – the way th[is] account was at the time, we could not put you in position (indiscernible) – |
| Baghdady: | No, no. You could, because you were calculating the way the – the premium was – was being – the margins was being calculated was not calculated on a Delta Neutral position. You were calculating the margin that every option was a separate – |
| Martin: | (Indiscernible) worse case scenario. Right. |
| Baghdady: | Exactly. This is not – this is not – this is totally opposite to the |

37:17, 66:2-11.)

The Court, therefore, finds that genuine issues of material fact exist as to whether Defendants actually used SPAN margin requirements and, if SPAN margin requirements were used, whether the SPAN margin requirements were correctly calculated and applied with respect to Plaintiff's positions.

## C.    Good Faith

Defendants contend that there is no genuine issue of material fact with regard to the issue of whether Plaintiff's account was liquidated in bad faith. Plaintiff, however, asserts that Defendants liquidated his account in bad faith contrary to his agreement with Herst. (Pl.'s Mem. at 4.) To support his position, Plaintiff offers the following tape recorded conversations (that occurred after his account was liquidated):

| | |
|---|---|
| Martin: | . . . *It was irrational the way the account was liquidated.* I told [Defendant Robbins] I wanted to work with you on liquidating the |

| | |
|---|---|
| | Exchange rules. This is totally opposite to everything. |
| Martin: | But that was the Exchange requirement. |
| Baghdady: | No. On cross margin if I'm short a position, the – these are covered calls. These are all covered calls. I did not have one single naked call. Puts, I mean. I did not have one single naked puts. Not one. *They were all covered puts.* |
| Martin: | *I agree with that.* (2nd Am. Complt., Ex. A, Tape One, pp. 36:9-37:17) (emphasis added). |
| | **** |
| Martin: | You had been on call – okay. H[ear] me out here. You had been on call. I should have hedged (indiscernible) – |
| Baghdady: | No, no. *I called because you are computing the margins wrong. The way your company is computing the margins was wrong.* And that is why I have been asking that you *send me the equity runs* pre – at – night (indiscernible). |
| Martin: | Which I did. (2nd Am. Complt., Ex. A, Tape One, p. 66:2-11) (emphasis added.) |

16

account. My instructions were, no. Get him out, or else you will not have a job on Monday morning. (2nd Am. Complt., Ex. A, Tape One, p. 67:13-18) (emphasis added).

Plaintiff further contends that Defendant Martin admitted to him that his S&P position could have been adjusted to make it delta-neutral by simply going short six contracts, and that, as the following relates, Defendant Robbins insisted upon liquidating the account rather than allowing the position to be adjusted which led to the debit and prevented him from realizing a profit:

Baghdady:     Yeah. The money was wired at 11:00 o'clock.

Martin:     Right.

Baghdady:     Yeah, so I mean.

Martin:     But your position – you did put positions in before that.

Baghdady:     No, no. I did not put any positions [in] that day. All my position was to exit.

Martin:     That's correct.

Baghdady:     Right. And I was doing it.

Martin:     Right.

Baghdady:     And then what – what happened, you told me – you decided or [Defendant Robbins] decided to liquidate the position.

Martin:     That's correct.

Baghdady:     So.

Martin:     That's correct.

Baghdady:     So I mean, the point is, the position could have been simply – very simply taken care of by –

Martin:     I agree.

| Baghdady: | – *by just adding five or ten futures.* Because I was Delta Neutral in the market. I don't care which way the [expletive] market goes, up or down. The market goes up, I'm making money. The market comes down, I'm making money. *All that I had to do was to adjust my Deltas. And you guys did not allow me to adjust my Deltas. Because [Defendant Martin] decided that he should go – he's going to liquidate the position. Am I saying anything wrong here?* |
|---|---|
| Martin: | *No. No. Not at all.* (2nd Am. Complt., Ex. A, Tape One, pp. 45-47)(emphasis added). |

Defendants, on the other hand, assert that the only evidence Plaintiff has of Defendant's alleged bad faith liquidation entails Defendant Martin's statements that: (1) it was irrational the way the account was liquidated; (2) Plaintiff's position could have been made delta-neutral by going short six contracts; and (3) Defendant Robbins insisted on liquidation instead of an adjustment. (Defs.' Reply at 10.) Defendants thus contend that a close reading of the transcript shows that Defendant Martin simply stated, "No. No. Not at all" to Plaintiff's statements which hardly constitutes a definitive statement on the part of Defendant Martin. (*Id.*) The Court, however, respectfully disagrees with the Defendants on this point(s). Based on a reading of the transcript in context, a reasonable inference is that Defendant Martin by saying "No. No. Not at all" does not disagree with Plaintiff's statements as above recited.

Plaintiff further offers the opinion of futures industry expert, Maduff, regarding the bad faith liquidation of his account. Maduff states:

[I]f [Plaintiff] had established positions based on SPAN margins and an agreement from the Defendants to continue using SPAN margins, then [Plaintiff] would be seriously injured if the Defendant brokers changed their margin computation after positions had been established and remained open, particularly if this resulted in the forced liquidation of all or a portion of his positions. In particular, Plaintiff would be seriously damaged if a margin call resulted in the Defendants taking control of his account away from him and liquidating positions quickly in an illiquid market rather than reducing the risk with other transactions in a more liquid market and later

liquidating positions in an orderly manner after the market had stabilized.

* * * *

Defendants acted fraudulently and in bad faith when they liquidated [Plaintiff's] positions as they did. (Defs.' Ex. 3, Maduff Dec. at 1-3.)

The Court, therefore, finds that a genuine issue of material fact exists as to whether Defendants' liquidation of Plaintiff's account was done in good faith.[15]

## CONCLUSION[16]

In view of the foregoing, the Court finds that a fair-minded jury could render a verdict for Plaintiff. Accordingly, Defendants' Motion for Summary Judgment is denied.[17]

---

[15]With regard to the issue of good faith, the District Judge stated (when ruling on an earlier Defendants' summary judgment motion):

> . . . [W]hile the Commodity Futures Trading Commission has universally held that a good faith liquidation of an undermargined account does not amount to fraud, there still exists a question of material fact as to whether the account was liquidated in good faith. Thus, defendants' argument that it is irrelevant that [Plaintiff] was not given notice of the liquidation because he waived this right in the Customer Agreement fails because there still exists a question of fact on whether any alleged misrepresentations were made, whether [Plaintiff] was able to trade using the delta neutral trading system in reliance on the alleged misrepresentation, and whether defendants used the SPAN margin requirements just prior to the liquidation. Therefore, summary judgment is not proper under these arguments. *Baghdady*, No. 97 C 8794, 1999 WL 162789, at *5.

[16]In view of the Court's ruling herein, it is deemed unnecessary to consider Plaintiff's and Defendant's other arguments raised herein.

[17]Since genuine issues of material fact exist as to the propriety of the subject liquidation (as discussed *supra*), Defendants' Motion for Summary Judgment on its cross-claim is also denied.

19

ENTER:

IAN H. LEVIN
United States Magistrate Judge

Dated: February 11, 2003